IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LINDSAY ACRE, *et al.*,           )
                                  )
        Plaintiffs,               )
                                  )
v.                                )     CIVIL ACT. NO.  2:14cv211-CSC
                                  )              (WO)
JASON CHAMBERS, *et al.*,         )
                                  )
        Defendants.               )

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

Plaintiffs Lindsay Acre ("Lindsay") and Robert Morris, as the personal representative of the Estate of Jeremy Acre ("Jeremy"), allege that defendant police officers, Jason Chambers ("Chambers") and Al Cox ("Cox"), used excessive force when they entered the Acre home without legal justification on March 19, 2013, and shot and killed Lindsay's husband, Jeremy.  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. ALA. LR 73.1, the parties have consented to a United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

This case is now pending before the court on the parties' motions for summary judgment.  *See* Docs. # 70 & 84.  The court heard oral argument on the motions on June 9, 2015.  After careful consideration of the motions, evidence and arguments in support of and in opposition to the motions for summary judgment, the court concludes that the plaintiffs' motion for summary judgment (doc. # 70) is due to be denied, and the defendants' motion

(doc. # 84) is due to be granted.

## II.  THE SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute][1] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); FED.R.CIV.P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law.").  The parties moving for summary judgment "always bear[] the initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movants may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving parties have failed to present evidence in support of some element of their case on which they bear the ultimate burden of proof.  *Id.* at 322-324.

---

[1]  Effective December 1, 2010, the language of Rule 56(a) was amended.  The word "dispute" replaced the word "issue" to "better reflect[] the focus of a summary-judgment determination." FED.R.CIV.P. 56(a), Advisory Committee Notes, 2010 Amendments.

Once the defendants meet their evidentiary burden and demonstrate the absence of a genuine dispute of material fact, the burden shifts to the plaintiffs to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to their case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; FED.R.CIV.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine [dispute] for trial."). A genuine dispute of material fact exists when the nonmoving parties produce evidence that would allow a reasonable fact-finder to return a verdict in their favor. *Greenberg*, 498 F.3d at 1263.

To survive the defendants' properly supported motion for summary judgment, the plaintiffs are required to produce "sufficient [favorable] evidence" establishing a violation of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence [on which the nonmoving parties rely] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) *quoting Anderson*, *supra*. Hence, when the plaintiffs fail to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to their case and on which the plaintiffs will bear the burden of proof

at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  FACTS[2]

Lindsay and Jeremy were high school and college sweethearts who subsequently married and had two children.  (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 18-19).[3]  Prior to 2013, the marriage was stressed at times due to finances and Lindsay's relationship with her parents.  (*Id.* at 20-21, 23-25, 27, 30, 35-36).

The tragic events that culminated in Jeremy's death on March 19, 2013 began much earlier.  On  February 17, 2013, Jeremy discovered that Lindsay had engaged in an extra-martial affair.  When Lindsay confessed to having the affair, Jeremy became angry, and they argued.  (*Id.* at 66).

> A.   On the night – on that night, yes, sir, we did have an argument.  And at times, yes, he and I both put our hands on each other.
>
> Q.   Did he push you?
>
> A.   In recalling the night, there were – there was just – there was a forcefulness about that night both – in both ways, so I – you know, my

---

[2]  The court construes the facts in the light most favorable to the non-movant plaintiffs, and draws all reasonable inferences in their favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," ... and 'resolve all reasonable doubts about the facts in favor of the non-movant.' . . . Moreover, the court must avoid weighing conflicting evidence or making credibility determinations. . . ."). Thus, the following facts are treated as undisputed for purposes of summary judgment.  Moreover, because the resolution of the defendants' qualified immunity defense is fact-specific, the court's review of the facts is detailed and extensive.

[3]   In support of their motions for summary judgment, and in opposition to the opposing parties' motion for summary judgment, the parties filed the depositions of Lindsay, Chambers and Cox as exhibits. Consequently, the court cites to the document and exhibit number as provided by the parties and references the specific page number of the particular deposition.  In referencing the deposition page number, the court uses the page number of the deposition; it does not refer the page numbering created by the court's electronic document filing system (CMECF).

husband did not walk up to me and just push me.   He – it was – involved – in an argument, he and I both, like I said, we laid our hands on each other.   And if it was forceful in any way, then it was due to the emotion of it.

Q.     Did he ever grab you?

A.     I believe – on the ABI statement, I did say that when my – when I tried to talk to my daughter that he did put his arms around me and pick me up.

Q.     Put you on the bed, too, didn't he?

A.     Yes, sir.

Q.     Tape your hands?

A.     No. He attempted.

Q.     Attempted.   And he was taping your hands to keep you from touching him or touching your child?   I was unclear on that.

A.     My husband told me that night to keep my hands off of him.   And my response was of a woman who was deeply remorseful and who wanted to comfort her husband.   And my husband was angry, and he had every right to be angry.

              *        *        *

A.     My husband and I did have a very heated argument.   My husband did tell me to take his hands – for me to take my hands off of him.   And I did not do as he wanted me to do, and my husband did pick me up.   And at one point – I was not choked. I was sort of restrained.   And there was – he did say if you do not keep your hands off of me, I'm going to duct tape – or I'm going to tape your hands behind your back.

              I mean, I – there was one point where, yes, I ended up on the bed and my hands were behind my back, and he was – he attempted to tie my hands.   And I said, I promise I won't do it

6

again, and he let my hands go.

(*Id*. at 66-67, 80-81).

After the argument on February 17, Jeremy left the family residence and went to stay with his parents.  During the early hours of February 19, Lindsay woke up to find Jeremy standing over her in the bedroom with a pistol in the waist band of his pants.

A:    . . . And in one of my interviews, I also stated that on that Tuesday, three o'clock in the morning, I woke up and my husband had entered the home, and he had – he had a gun in his pants.

Q:    So this was going to be early morning the 18th then, correct?

A:    Actually, Sunday was the 17th, correct?

Q:    Right.

A:    So it would have been February the 19th.

Q:    The 19th. All right.  Go ahead.  So he came back.

A:    Yes, sir.

Q:    All right.  Go ahead.  I'm sorry.

A:    I believe it was about three o'clock in the morning.  And I woke up, and he was standing at my bed.  And he raised his shirt up and there was a gun, and he said, where's your boy? Where's your boy? And I said –

            *       *       *

A:    And I said, I don't know.  I don't know.  What are you doing?

Q:    What did he say?

7

A:    I  just recall him being – again, I mean, he was angry, and he was hurt and – . . .

(*Id*. at 81-82).

After the encounter with Jeremy in the early hours of February 19, Lindsay told Michelle Zeigler ("Michelle"), a co-worker,[4] that she wanted to talk to her husband, Chris Zeigler ("Zeigler").  (*Id*. at 78, 82, 84).  Lindsay knew that Zeigler was a deputy sheriff with the Elmore County Sheriff's Department.  (*Id*. at 78-79).  Zeigler met with Lindsay, and he completed an Alabama Uniform Incident/Offense Report.  (Doc. # 86, Ex. N).  Zeigler named Jeremy as the "listed offender," and listed the offenses as "D.V. Harassment" and "D.V. by strangulation or suffocation"[5] between February 17, 2013 at 22:00 hours and

---

[4]  Lindsay and Michelle worked together as teachers at a local elementary school.  Michelle was aware of the affair because Lindsay told her about it before she admitted it to Jeremy.

[5]  Zeigler noted the offenses as ALA. CODE § 13A-6-132 and § 13A-6-138.   Pursuant to ALA. CODE § 13A-6-132,

> [a] person commits domestic violence in the third degree if the person commits the crime of assault in the third degree pursuant to Section 13A-6-22; the crime of menacing pursuant to Section 13A-6-23; the crime of reckless endangerment pursuant to Section 13A-6-24; the crime of criminal coercion pursuant to Section 13A-6-25; the crime of harassment pursuant to subsection (a) of Section 13A-11-8; the crime of criminal surveillance pursuant to Section 13A-11-32; the crime of harassing communications pursuant to subsection (b) of Section 13A-11-8; the crime of criminal trespass in the third degree pursuant to Section 13A-7-4; the crime of criminal mischief in the second or third degree pursuant to Sections 13A-7-22 and 13A-7-23; or the crime of arson in the third degree pursuant to Section 13A-7-43; and the victim is a current or former spouse, parent, child, any person with whom the defendant has a child in common, a present or former household member, or a person who has or had a dating or engagement relationship with the defendant. Domestic violence in the third degree is a Class A misdemeanor.

ALA CODE § 13A-6-138 defines domestic violence by strangulation of suffocation as follows:

a) For the purposes of this section, the following terms have the following meanings:

February 19, 2013 at 06:00 hours.  Zeigler also noted that Jeremy possessed an "unknown

type [of] pistol."  In the narrative section of the offense report, Zeigler described the events

as follows.

> The victim [Lindsay] stated that between the listed dates and times the listed offender [Jeremy] has been abusive.  The victim stated that the offender grabbed her and choked her.  He also pushed her around the house and attempted to bind her up with duct tape.  The offender constantly cursed her and made threats toward her.  The victim stated the offender came home at 0500 hrs with a pistol and made threats to kill himself.  He also made threats toward another suspect not on the scene.  The victim was very upset and complained of being sore from being pushed around.  The victim was mentally and emotionally a wreck.

(Doc. # 86, Ex. N at 3).

Lindsay concedes that she provided the information to Zeigler that formed the basis

---

> (1) Qualified relationship. The victim is a spouse, former spouse, parent, stepparent, child, stepchild, or a person with whom the defendant has a child in common, or with whom the defendant has or had a dating or engagement relationship within 10 months preceding this event.

> (2) Strangulation. Intentionally causing asphyxia by closure or compression of the blood vessels or air passages of the neck as a result of external pressure on the neck.

> (3) Suffocation. Intentionally causing asphyxia by depriving a person of air or by preventing a person from breathing through the inhalation of toxic gases or by blocking or obstructing the airway of a person, by any means other than by strangulation as defined in this section.

> (b) A person commits the crime of domestic violence by strangulation or suffocation if the person commits an assault with intent to cause physical harm or commits the crime of menacing pursuant to Section 13A-6-23, by strangulation or suffocation or attempted strangulation or suffocation against a person with whom the defendant has a qualified relationship.

> (c) Domestic violence by strangulation or suffocation is a Class B felony punishable as provided by law.

9

of the incident report.[6]   (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 88).   After Zeigler

completed the incident report, Lindsay signed it.   She then asked what would happen to

Jeremy.  (*Id*. at 96).

> A:     . . . And after I signed my name to this, that's when I said, what is going
> to happen to my – I had no idea.  I said, what's going to happen to my
> husband?  And [Zeigler] said, we're going to go find him and lock him
> up.
>       And I said, what about the children?  He said, they're going to
> have supervised visitation with their father.  And I said, no.  I don't
> know if you're aware of that.
>
> Q:     And what about – and you did not want to prosecute him for what is –
>
> A:     I told him to rip it up.
>
> Q:     It was on their form?
>
> A:     I told him to rip it up, and I told him we were both at fault and that my
> husband was angry and he had every right to be.

(*Id*.).

On February 20, 2013, Jeremy began moving out of the family home.  (*Id*. at 90, 93).

When Lindsay came home from school, she saw Zeigler and another deputy parked down the

street from their home.  (*Id*.)  Jeremy also saw the officers and told Lindsay to talk to Zeigler

and "set this straight."[7]  (*Id*. at 95).  Zeigler and the deputy approached Jeremy while he was

---

[6]  After the tragic death of Jeremy on March 19, 2013, Lindsay gave a statement to investigators of
the Alabama Bureau of Investigation.  (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 88).  At that time, she
clarified that Jeremy did not choke her, but rather restrained her with his forearm.  (*Id*. at 89)  Lindsay was
admittedly emotionally distraught at the time she spoke with Zeigler.  (*Id*. at 89).  However, Lindsay does
not dispute that the incident report was based on information she provided Zeigler on February 19, 2013.

[7]  At some point after she met with Zeigler, Lindsay told Jeremy that she had talked to the deputy
sheriff. (*Id*. at 96).

in the garage.  (*Id*. at 101).  Lindsay left and returned to work.  (*Id*. at 102).  According to

Lindsay, Jeremy later told her about his conversation with Zeigler.  (*Id*.)

> A.     . . . My husband told me afterwards, he said that [Zeigler] said, hey
> man, you know in other circumstances we would have probably been
> friends and, you know, you've got to watch it because a woman, you
> know, she can say domestic violence and, you know, you can get in
> trouble.

(*Id*.)

On March 19, 2013, Lindsay met her friend Amy Shumate ("Shumate") at the school

where Lindsay taught.[8]  Lindsay admitted to Shumate that she had an affair and that Jeremy

knew about it.  (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 107).  Lindsay and Shumate left the

school and went to Lindsay's home.  (*Id*. at 108).  Jeremy was home when they arrived.[9]  (*Id*.)

Shumate described the atmosphere as "very tense and awkward."  (Doc. # 86, Ex. D, Att. 2).

Instead of spending the night as she planned, Shumate decided to return to Trussville.  (*Id*.)

Shumate acknowledged that before she left, Jeremy "looked mad."  (*Id*.)

While on her way home, Shumate engaged in a text message exchange with Jeremy.

(Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 111).  Shumate admits the "conversation" became

"heated" because she "let him have it."  (Doc. # 86, Ex. D, Att. 2).  According to Shumate,

she "advised JEREMY that she was aware he had threatened to kill himself in the past with

---

[8]  Shumate had driven from Trussville, Alabama specifically to see Lindsay.  (Doc. # 86, Ex. D, Att. 2).

[9]  Although there are indications that Jeremy stayed with his parents occasionally after he found out about the affair, it appears that he never actually moved out of the family home.

a gun, threatened to kill the person LINDSAY had the affair with, and had an alcohol and

drug problem." (*Id*.)  Shumate also told Jeremy it was "his fault" that Lindsay had an affair.

(*Id*.)  Although Lindsay believes Jeremy was provoked by Shumate, she admitted that he was

angry and "visibly upset." (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 121-22).

When Shumate arrived home in Trussville, Lindsay called her.[10]   Shumate said

Lindsay was calm, but she could hear Jeremy "screaming in the background." Shumate heard

Jeremy call Lindsay a whore, and he threatened to file for divorce. (Doc. # 70, Ex. E & Doc.

# 86, Ex. A1 at 122).  Jeremy also called Shumate a "fucking bitch." (*Id*.)

When this call ended, Shumate called Michelle because Shumate knew she was

married to Zeigler who she also knew was a law enforcement officer. (Doc. # 86, Ex. D, Att.

2).  Although Shumate did not articulate a specific threat to Lindsay, she told Michelle that

"she was concerned for LINDSAY and her children and wanted to pass it on to Chris." (*Id*.)

As a result of Shumate's phone call to his wife, Zeigler called Chambers on his police

radio and asked him perform a "welfare check" at the Acre residence. (Doc. # 70, Ex. A &

Doc. # 86, Ex. B at 24).  Zeigler told Chambers about the call from Shumate "who advised

[Zeigler] that she had just left the Acre residence and Jeremy Acre and Lindsay Acre were

possibly engaged in a domestic violence type of situation." (*Id*. at 30)  It is  undisputed that

Zeigler told Chambers that "the Acres were potentially involved in a physical altercation at

---

[10]   According to Lindsay, Jeremy asked her to call Shumate using the speaker phone feature,
presumably so that he could hear the conversation.

that time."[11]  (*Id*. at 31).   Zeigler also told Chambers that two weeks earlier, Zeigler had

completed an incident and offense report involving Jeremy and Lindsay.  (*Id*. at 31-32).

Zeigler reported to Chambers that "Jeremy had allegedly strangled his wife and bound her

with duct tape and, I believe, threatened her with some type of weapon, I believe a handgun."

(*Id*. at 32).   Zeigler also told Chambers that Lindsay refused to pursue criminal charges

against Jeremy.  (*Id*.)   Zeigler informed Chambers that "this problem with the Acres had been

going on for a couple of weeks," and "it was kind of a tense situation between the two of

them."  (*Id*. at 36-37).   It is undisputed that Zeigler warned Chambers that Jeremy owned a

weapon.  (*Id*. at 36).   Finally, Zeigler told Chambers to "use extreme caution" with Jeremy

and to take another officer with him.  (*Id*. at 37).

Chambers called dispatch to advise that he was going to the Acre residence, and then

he called Deputy Cox.  (*Id*. at 43).   Chambers "briefed" Cox about the call from Zeigler.[12]

---

[11]  It is now clear that when Chambers and Cox arrived at the Acre home, there was no physical altercation.  However, there is no evidence that Chambers or Cox knew that at the time.

[12]  Cox was also aware of the difficulties between Lindsay and Jeremy because he sometimes did extra work at the elementary school, and Zeigler had previously warned him about Jeremy.  *See* Doc. # 70, Ex. B & Doc. # 86, Ex C at 17.

Q:   Did you know who Jeremy Acre was before this night?

A:   No, sir.  The only thing was that I was working the school one day, extra-duty job. I was working Holtville.  And it might have been somewhat in close proximity when – after the report was done that Zeigler done.  And Zeigler came through the school – Lieutenant Zeigler had come through the school and told me that, hey, we want you to be aware of this guy because he may come to the school. If I'm not correct, I think his wife was an elementary schoolteacher.

Q:   That's correct.  Did he give you his name?

(*Id.* at 44). "Just told him that I was told by Lieutenant Zeigler that there was possibly a physical altercation going on at their residence and that Mr. Acre has been known to have a weapon and I don't know if he would have it at this time, but just to use extreme caution." (*Id.*).

Zeigler told Chambers that there was only the possibility of a physical altercation. (*Id.* at 34). It is undisputed that Chambers had no information that Lindsay was injured or that Jeremy had struck her. (*Id.* at 47 & 49).

At approximately 10:54 p.m., Chambers and Cox arrived at the home of Jeremy and Lindsay. (*Id.* at 53). The house was dark because Lindsay and Jeremy were getting ready for bed. (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 129). The officers first listened at the front door, heard nothing and then knocked. (Doc. # 70, Ex. A & Doc. # 86, Ex. B at 52). After getting no response, the officers knocked again. (*Id.* at 56). Lindsay told Jeremy she thought

---

A:    He just said Jeremy Acre.

Q:    Okay.

        *       *       *

A:    He had just told me that there had been some domestic violence issues. I don't remember if he told me all the details of what had happened.

Q:    Okay.

A:    He just – I know that he told me that he just wanted everybody to know that was working that day and working school that it's a possibility that he may come up there and cause a problem and wanted – he wanted me to be aware of it.

*Id.* at 17-18.

someone was at the door.  (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 130).  Jeremy armed

himself with a gun and went to the door.  (*Id*. at 131).

Immediately prior to the door opening, the officers heard a gun being chambered with

a round of ammunition.[13]  (Doc. # 70, Ex. A & Doc. # 86, Ex. B at 56).  Chambers turned to

Cox and said "hey, that's a gun."  (*Id*. at 59).  Chambers drew his service weapon and held

it by his side.  (*Id*.).  Jeremy opened the door with more force than usual, and he was holding

a handgun.[14]  (Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 134, Ex. A2 at 151).  Although the

deputies did not identify themselves, it is undisputed that they were in uniform.  (Doc. # 70,

Ex. A & Doc. # 86, Ex. B at 57).

When Jeremy saw the officers, he looked at Lindsay.  (Doc. # 70, Ex. E & Doc. # 86,

Ex. A1 at 136, Ex. A2 at 153).  Lindsay's immediate response to Jeremy was "I didn't call

them."[15]  (*Id*. at 136, 138, 153).

---

[13]  In her affidavit submitted in opposition to the defendants' motion for summary judgment, Lindsay
asserts that she did not "see or hear [Jeremy] either chamber a round in his gun or cock the hammer on the
gun." (Doc. # 93, Ex. 1 at 2).  Lindsay's assertion in her affidavit does not create a genuine dispute sufficient
to preclude summary judgment about whether Jeremy chambered a round because the parties all agree that
when Jeremy answered the door, he was holding a gun, and it was visible to Chambers and Cox.
Consequently, it is immaterial whether Jeremy actually chambered a round before he opened the door.

[14]  The deputies contend that Jeremy "violently . . . slung the door open." (Doc. # 70, Ex. A & Doc.
# 86, Ex. B at 61).  However, the court must construe the facts in the light most favorable to the plaintiffs
so for the purpose of the motions for summary judgment, Jeremy opened the door with more force than usual
but he did not "sling it open."

[15]  In her affidavit, Lindsay contends she then turned to the officers and said "something to the effect
of "there is no need for you here.  Please go away." (Doc. # 93, Ex. 1 at 3).  In her deposition, Lindsay
answered specific questions about what was said when Jeremy opened the door.

> Q:     When you were standing in that area, did you say anything to Jeremy about the
>            deputies?

Jeremy was holding the handgun at his side, and he was not threatening the officers

with the weapon.  Nonetheless, Chambers asked Jeremy to put his gun down, and Jeremy

refused.  (Doc. # 70, Ex. A & Doc. # 86, Ex. B at 62).  Chambers then pointed his service

---

A:      When my husband opened the door, he looked at me.

Q:      And did you say anything to him?

A:      I didn't call them.

Q:      Is that what you said?

A:      Uh-huh.  (Positive response).

        *       *       *

Q:      Is that when you said that you didn't call them?

A:      It was – it was either right before or right after that.

Q:      When you said that you hadn't called them, is it your recollection then – I know this
        has been a while back.  Is it your recollection that you made the statement I didn't
        call them and then thereafter they said we had gotten a call, or they said the other
        way, we had gotten a call and then you made the comment – a statement I didn't call
        them?

A:      I remember my husband looking at me, and I remember saying I didn't call them.

(Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at 136-38, Ex. A2 at 153).

A district court is free to disregard a sworn affidavit if it is contradictory to prior deposition testimony. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). In addition, in his deposition, Chambers does not indicate that he heard Lindsay make that statement.

Finally, even if Lindsay made the statement, "you are not needed here," her statement is insufficient to create a genuine dispute of material fact about whether the officers should have left at that point. It is common knowledge that victims of domestic abuse often deny that there is a problem. Consequently, it was reasonable for Chambers to continue to investigate the situation to ensure Lindsay's safety before accepting her statement and leaving the scene.  *See Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) ("under the circumstances [the deputy] confronted it was objectively reasonable for him to believe that [the plaintiff] might still be in need of immediate aid . . .")

weapon at Jeremy and demanded that Jeremy put down the gun.  (*Id*.).

> A:    At that point in time, he's committing the crime of obstructing governmental operations because he's prohibited me from conducting the investigation into the alleged domestic violence that I was originally there to check on.

> Q:    And how is he doing that?

> A:    Because I'm not able to conduct an investigation into the domestic violence because I'm dealing with a now armed and enraged individual who's refusing to follow commands and put the gun down.  So I don't have time to conduct the investigation.  I've got to control this armed individual.

(*Id*. at 63).

Chambers believed Jeremy was angry and agitated when he opened the door.  (*Id*. at 65, 81).  Chambers and Cox ordered Jeremy to put the gun down numerous times.  (*Id*. at 73, 79, 81).  Because Jeremy refused to put the gun down, Cox made the statement that he was going to use his taser on Jeremy.  (*Id*. at 81, 88).  Chambers directed Cox to deploy his taser.  (*Id*. at 88-89).

Jeremy responded that he was not going to be tasered in his own home, and he attempted to close the door.  (*Id*. at 82-83).  Chambers placed his foot in the door to prevent Jeremy from shutting the door.  (*Id*. at 83).  Terrified, Lindsay turned away.  Lindsay did not see what happened next.

> Q:    Did you see Jeremy get tased?

> A:    No.

> Q:    Did you see Jeremy be shot?

17

A:     No.

                *        *        *

Q:     But you did not see it?

A:     (Shakes head from side to side).
       MR. FULLER [Lindsay's attorney]:  That's a no.

Q:     That's a no?

A:     No.

Q:     That's fine.  Did you hear the deputies tell your husband to put the gun
       down?

A:     Yes.

Q:     Did you ever see him put the gun down?

A:     No.

(Doc. # 70, Ex. E & Doc. # 86, Ex. A1 at  at 139-40, 141; *see also*, Ex. A2 at 150).

Chambers then pushed the door open so he "could make sure that [Jeremy] wasn't

fixing to try to shoot me through the door or cause harm to the female who I – I didn't

know." (Doc. # 70, Ex. A & Doc. # 86, Ex. B at 84).  As Chambers opened the door, Jeremy

was backing up from the door.  (*Id*.)

Jeremy continued to refuse to put down the handgun, and Cox fired his taser at

Jeremy.[16]  (*Id*. at 84, 86).  When he was tasered, Jeremy fell backwards to the floor in the

---

[16]  The plaintiffs assert that a data download obtained from Cox's taser revealed that the taser had
been fired at 23:08:11.  The call information report from the Elmore County Sheriff's department indicates
that shots were fired at the Acre residence at 22:58:43.  Although the defendants assert that Cox fired the
taser before Chambers shot Jeremy, the plaintiffs argue that the data download on the taser demonstrates that

hall.  (*Id*. at 91-92, 96).   The taser deployed an electrical charge for approximately five (5)

seconds.  (*Id*. at 93-96).   Chambers approached Jeremy as he lay on the ground.   (*Id*. at 93,

97).   According to Chambers, Jeremy "jumped to his feet," and "aggressively" came towards

them.[17]  (*Id*. at 99-100).   Chambers shot him.   (*Id*.).   It is undisputed that Jeremy was still

---

Jeremy was tasered approximately nine (9) minutes after the officers reported that shots had been fired.

However, Lindsay's deposition testimony does not support this sequence of events.

> Q:     This is going to sound like a silly question.  But after you heard the pop, did you see anybody tase your husband after you heard the pop?
> A:     After I – after I heard the pop and when I – when I looked up, that's when I looked over and say my husband.
> Q:     Right.
> A:     So the answer would be no.
> Q:     And when he was laying on the ground, you didn't see anybody tase – on the floor, you didn't see anybody tase your husband?
> A:     No.

(Doc. # 86, Ex. A2 at 168-69).

Ultimately, this dispute is not material because the excessive force issue relates to the use of deadly force.

[17] In her affidavit submitted in opposition to the defendants' motion for summary judgment, Lindsay stated that Jeremy did nothing to threaten the officers and was retreating into the house immediately before he was shot. (Doc. # 93, Ex. 1 at 5).  However, she admitted that she "did not want to see what was about to happen.  Within seconds, [she] heard one loud "pop" and immediately smelled gunpowder."  (*Id*.).  She "then turned and saw [Jeremy] standing in a door to the hall, . . ."  (*Id*.).

In her deposition, Lindsay stated that she heard a "scuffle" before she heard the pop and smelled the gunpowder.  (Doc. # 86, Ex. A2 at 162-64).

> Q:     Then what happens?
> A:     I heard — I heard motion in the hall.
> Q:     Did you hear any voices still yelling after you heard the word "taser"?
> A:     I didn't. I didn't.
> Q:     You didn't hear any voices?
> A:     I didn't hear voices.  I heard – I heard it was almost like a scuffle of some sort in the hall.
> Q:     Heard a scuffle?
> A:     Yes.  I heard something almost like someone hitting a wall or not hitting, but

holding the gun in his hand when he was shot.

The Elmore County Sheriff's Department Call and Unit Information report shows that

Chambers and Cox arrived at Jeremy and Lindsay's residence at 10:54:18 p.m.  (Doc. # 70,

---

|  | running into a wall. |
| Q: | All right. |
| A: | And – and that's when I heard the sound, the pop. |
| Q: | Did you hear the scuffle before you heard the pop? |
| A: | Yes. |

*        *        *

| Q: | . . . And you turned away from what was going on to your right so that it was behind you now? |
| A: | When I turned, it as on this side of me. |

*        *        *

| Q: | . . .  I'm following you now.  So you do that, you cover your ears correct? |
| A: | Yes. |
| Q: | You close your eyes, correct? |
| A: | Yes. |
| Q: | You're looking away from the commotion over in the foyer? |
| A: | It was now in the hall. |
| Q: | In the hall.  So you are looking away from that area, correct? |
| A: | Correct. |
| Q: | You hear a scuffle, correct? |
| A: | Correct. |
| Q: | And then you hear a pop? |
| A: | Yes. |
| Q: | Do you smell anything at that time? |
| A: | Gunpowder. |

(*Id*. at 161-62, 163-64).

She opened her eyes and saw Jeremy standing in the hallway with blood on his shirt.  (*Id*. at 164-65).
Consequently, Lindsay's statement in her affidavit that Jeremy was not threatening the officers and was
retreating does not create a genuine dispute of fact because Lindsay did not see what happened after she had
turned away and covered her ears and eyes.

At oral argument on the motions for summary judgment, plaintiffs' counsel suggested, *for the first
time*, that Jeremy was shot *as he lay on the floor*.  According to counsel at oral argument, the angle of the
bullet's trajectory indicates that Jeremy was on the ground when he was shot.  Counsel's argument is not
supported by the evidence, and as noted, Lindsay saw Jeremy standing after the fatal shot was fired.

Ex. D).  Shots were reported fired at 10:58:43.  (*Id*.)

Jeremy tragically died at the scene as the result of Chambers' single gunshot to his chest.

## III.  DISCUSSION

### A.  Motion to Strike

Before addressing the pending motions for summary judgment, the court disposes of the plaintiffs' motion to strike (doc. # 93).  The plaintiffs seek to strike certain information relied on by the defendants either in support of or in opposition to the pending motions for summary judgment.  The plaintiffs argue that certain exhibits should be stricken because the defendants do not reference the exhibits in their arguments, and "neither their relevance nor their purpose is otherwise explained." (Doc. # 93 at 5).  The plaintiffs do not assert that they have been prejudiced by the filing of the defendants' exhibits.

Moreover, the plaintiffs argues that the defendants' recitation of facts in their statement of facts should be stricken because these facts "were clearly not known to these Defendants at the time they killed Jeremy Acre and invaded Lindsay's home." (*Id*. at 6).  The court recognizes that the argument of counsel and the recitation of the facts are simply counsel's interpretation of the facts.  The court is capable of sifting through the evidentiary material and considering only those portions which are either based on the declarant's personal knowledge or are not being offered for the truth of the matter asserted. Accordingly, for these reasons, the plaintiffs' motion to strike (doc. # 93) will be denied.

## B. Parties' Positions

In their motion for summary judgment, the plaintiffs assert that the defendants violated Jeremy's Second Amendment right to bear arms and that the defendants had no right or power to interfere with that right. According to the plaintiffs, the defendants' demands to Jeremy to put down his firearm were unlawful because they had no probable cause to believe Jeremy had committed a crime. The plaintiffs argue that Jeremy had a constitutional right to disobey the officers' commands to relinquish his weapon. The plaintiffs further argue that the defendants then violated Jeremy and Lindsay's Fourth Amendment rights by entering their home without justification. Finally, the plaintiffs assert that the defendants used excessive force when they used deadly force against Jeremy. *See* Doc. # 71 & 93.

In response, the defendants assert that they are entitled to summary judgment as a matter of law for several reasons. First, they argue that they did not violate the Acre's Fourth Amendment rights by entering their home without a warrant because exigent circumstances required their intervention. Next, the defendants assert that the use of deadly force was reasonable under the circumstances. In the alternative, the defendants assert that they are entitled to qualified immunity because the law was not clearly established that reasonable officers in their positions could not enter the house to protect themselves and Lindsay, nor could they use deadly force under the circumstances. *See* Doc. # 85 & 92.

## C. Qualified Immunity

No one disputes that the tragedies of this case are manifest. Jeremy lost his life,

Lindsay lost her husband, and two little girls lost their father.  Nonetheless, the defendants

argue that they are entitled to qualified immunity for their actions on March 19, 2013.  A

decision about qualified immunity is "completely separate from the merits of the action."

*Plumhoff v. Rickard*, — U.S. —, —, 134 S.Ct. 2012, 2019 (2014).  Qualified immunity offers

complete protection for government officials sued in their individual capacities if their

conduct does not violate "clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (officials

"shielded from liability for civil damages if their actions did not violate 'clearly established

statutory or constitutional rights of which a reasonable person would have known'" (quoting

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Vinyard v. Wilson,* 311 F.3d 1340,

1346 (11th Cir. 2002).  Qualified immunity is not merely a defense against liability but rather

immunity from suit.  *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (citation omitted);

*Plumhoff*, — U.S. at —, 134 S.Ct. at 2019 ("[Q]ualified immunity is 'an immunity from suit

rather than a mere defense to liability.")

> "Qualified immunity shields government officials from civil damages liability
> unless the official violates a statutory or constitutional right that was clearly
> established at the time of the challenged conduct."  *Reichle v. Howards*, 566
> U.S. —, —, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012).  "To be clearly
> established, a right must be sufficiently clear that every reasonable official
> would have understood that what he was doing violates that right."  *Ibid*.
> (brackets and internal quotation marks omitted).  "When properly applied,
> [qualified immunity] protects all but the plainly incompetent or those who
> knowingly violate the law."  *Ashcroft v. al-Kidd*, 563 U.S. —, —, 131 S.Ct.
> 2074, 2085, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted).  "We
> do not require a case directly on point, but existing precedent must have placed
> the statutory or constitutional question beyond debate."  *Id*., at —, 131 S.Ct.

at 2083.

*Taylor v. Barkes*, — U.S. —, —, 135 S.Ct. 2042, 2044 (2015).

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."" *City and County of San Francisco, Ca. v. Sheehan*, — U.S. —, —, 135 S.Ct. 1765, 1774 (2015).

Qualified immunity shields government officials performing discretionary functions from suits in their individual capacities unless their conduct violated clearly established statutory or constitutional rights. *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007). To receive qualified immunity, the defendants must first demonstrate that they were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that defendants Chambers and Cox were acting within the course and scope of their discretionary authority during their encounter with Jeremy. Thus, the burden shifts to the plaintiffs to demonstrate that the defendants are not entitled to qualified immunity. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To satisfy their burden, the plaintiffs must show two things: (1) that the defendants committed a constitutional violation, and (2) that the constitutional right the defendants violated was "clearly established." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004). "If the law is not clearly established, then the court should dismiss the case

against the government official." *Merricks v. Adkisson*, 785 F.3d 553, 559, (11th Cir. 2015).

It is a fundamentally basis tenet of law that the sanctity of the home is protected by the Fourth Amendment. U.S. CONST. AMEND. IV.[18] The Amendment's primary purpose is to protect citizens from unwarranted governmental intrusion and to prevent abusive police power. *See United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (plurality opinion); *Johnson v. United States*, 333 U.S. 10, 13 (1948).

> As to the basic right in question, privacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginnings of the Republic. This common understanding ensures respect for the law and allegiance to our institutions, and it is an instrument for transmitting our Constitution to later generations undiminished in meaning and force. It bears repeating that it is a serious matter if law enforcement officers violate the sanctity of the home by ignoring the requisites of lawful entry. Security must not be subject to erosion by indifference or contempt.

*Hudson v. Michigan*, 547 U.S. 586, 603 (2006) (Kennedy, J., concurring in part and concurring in the judgment). The Fourth Amendment draws a firm line at the threshold of a residence because "'[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Payton v. New York*, 445 U.S. 573, 589-90 (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

However, the sanctity of the home is not absolute; the Fourth Amendment protects

---

[18] Specifically, the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

against *unreasonable* searches and seizures. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'...") (emphasis added). "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure"of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). There are a limited set of well-defined exceptions to the warrant requirement. *See Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception is exigent circumstances. "The exigent circumstances exception encompasses situations such as hot pursuit of a suspect, risk of removal or destruction of evidence, and danger to the arresting officers or the public." *United States v. Hall*, 500 F. App'x 819, 820 (11th Cir. 2012). "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

When considering a qualified immunity defense, the court has the discretion to determine which prong of the analysis it should address first in light of the particular circumstances of the case before it. *Pearson*, 555 U.S. at 236; *Ashcroft v. al-Kidd*, 563 U.S. 731, —, 131 S.Ct. 2074, 2080 (2011) ("courts have discretion to decide which of the two prongs of qualified immunity analysis to tackle first."). Because the court concludes that the law governing the officers' conduct was not clearly established on March 19, 2013, the court

addresses only the second prong of the qualified immunity analysis.

The plaintiffs broadly define the "clearly established rights" they claim were violated as Jeremy's Second Amendment right to bear arms in his own home, and/or his Fourth Amendment right to be free from unreasonable searches and seizures.  According to the plaintiffs, Jeremy had "a clearly established right to carry and bear arms in his own home," and that right was violated when the defendants shot him simply because he did not put down the gun.  The plaintiffs argue that "given that Jeremy had not committed any crime that night, the order to put the gun down was not lawful."  (Doc. # 93 at 15).  For purposes of qualified immunity, the "relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Roberts*, 643 F.3d at 904-05.

The Supreme Court has disavowed a generalized approach to what is clearly established law in the qualified immunity context.

> We have repeatedly told courts . . . not to define clearly established law at a high level of generality."  *al-Kidd*, *supra*, at —, 131 S.Ct., at 2084 (citation omitted); cf. *Lopez v. Smith*, 574 U.S. —, —, 135 S.Ct. 1, 3-4, 190 L.Ed.2d 1 (2014) (*per curiam*).  Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures.

*Sheehan*, — U.S. at —, 135 S.Ct. at 1775-76.

"The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of

particular conduct is clearly established."[19]   *al-Kidd*, 563 U.S. at —, 131 S.Ct. at 2084. Consequently, the court must more specifically define the "clearly established rights" at issue in this case, and concludes, therefore, that there are two salient questions before it.  The first question is whether on March 19, 2013, reasonable officers would believe that their entry into the Acre home because Jeremy would not put down his weapon was unlawful under the circumstances.  The plaintiffs seek to frame the argument as Jeremy having a constitutional right to refuse to comply with Chambers and Cox's orders that he put down his gun and to shut the door to foreclose any further investigation into the welfare of Lindsay.  Relying on the Second Amendment, they assert that Jeremy had the right to bear arms in his own home. That right is not disputed, nor is it at issue in this case.  The plaintiffs do not point to, and the court has not found, any cases which in any way support the plaintiffs' argument that Jeremy's Second Amendment rights include a right to continue to wield a weapon after defendant police officers asked him to put it down.  It is undisputed that the officers did not attempt to take the gun from Jeremy.  They asked, for their own safety and the safety of Lindsey and anyone else in the home, that Jeremy put down the gun.

---

[19]  The Eleventh Circuit also utilizes an "obvious-clarity" method which creates a narrow exception to the general rule requiring particularized case law to determine whether a right is clearly established." *Fils v. City of Aventura*, 647 F.3d 1272,1291 (11th Cir. 2011).  *See also Jay v. Hendershott*, 579 F. App'x 948, 951 (11th Cir. 2014); *Bussey-Morice v.Gomez*, 587 F. App'x 621, 627-28 (11th Cir. 2014).  The "obvious-clarity" method "looks not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law.'" *Fils*, 647 F.3d at 1291; *Jay*, 579 F. App'x at 951.  The facts of this case – Jeremy was non-compliant, uncooperative, hostile and potentially violent – take this case out of the realm of the narrow scope of the "obvious-clarity" exception.

> A right is clearly established only if its contours are sufficiently clear that "a reasonable officer would understand that what he is doing violated that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S., at —, 131 S.Ct. at 2085. This doctrine "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id*., at —, 131 S.Ct., at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

*Carroll v. Carman*, — U.S. —, —, 135 S.Ct. 348, 350 (2014); *Sheehan*,— U.S. at —, 135 S.Ct. at 1774. *See Plumhoff*, — U.S. at —, 134 S.Ct. at 2023; *Stanton v. Sims*, — U.S. —, —, 134 S.Ct. 3, 4-5 (2013); *Messerschmidt v. Millender*, — U.S. —, —, 132 S.Ct. 1235, 1244 (2012).

Moreover, the cases are legion in holding that an officer has the right to take command of a situation to secure his own safety as well as the safety of others. *See e.g., Maryland v. Wilson*, 519 U.S. 408 (1997) (Police officers making traffic stop may order passengers to get out of car because officer safety is a legitimate and weighty interest). Indeed, it is unreasonable to require officers to take unnecessary risks in the performance of their duties. *Terry v. Ohio*, 392 U.S. 1, 23 (1968). While these cases arise in the context of criminal law enforcement, the plaintiffs have not shown that in the context of a civil case interest in officer safety is diminished. The court concludes that the law was not clearly established such that a reasonable officer would know that entry into Jeremy's house because he would not put down his weapon was unlawful.

The second question is whether, for the purpose of qualified immunity, a reasonable

officer would know that using deadly force when confronted by an angry and armed homeowner was unlawful.

> The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay "would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-299 (1967). This is true even when, judged with the benefit of hindsight, the officers may have made "some mistakes." *Heien v. North Carolina*, 574 U.S. ___, ___, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). The Constitution is not blind to "the fact that police officers are often forced to make split-second judgments." *Plumhoff, supra*, at ___, 134 S.Ct., at 2020.

*Sheehan*, 135 S.Ct. at 1775.

Thus, in evaluating the reasonableness of the officers' actions, the court examines the facts "from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[20]  The court's analysis must "allo[w] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'"

---

[20] Whether the defendants used excessive force in violation of the Fourth Amendment is analyzed under an "objective reasonableness standard."

> [T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motive. *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872 (internal quotation marks omitted). The use of deadly force is "more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers and others; the suspect committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force." *Penley*, 605 F.3d at 850 (citing *Tennessee v. Garner*, 471 U.S. 1, 11-12, 105 S.Ct. 1694, 1701-02 (1985)). Also relevant is whether the officer "had [an] articulable basis to think [the suspect] was armed." *Garner*, 471 U.S. at 20, 105 S.Ct. at 1706.

*Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015).

*Plumhoff*, — U.S. at —, 134 S.Ct. at 2020 (internal citations omitted).  *See also Kentucky v.*

*King*, 563 U.S. 452, —, 131 S.Ct. 1849, 1860 (2011).

When they arrived at the Acre's house, Chambers and Cox possessed the following

information:

- A friend was sufficiently concerned about Lindsay's safety that she called Zeigler.

- Zeigler told Chambers about the incident report so the officers were aware of recent allegations of domestic abuse.

- Only weeks earlier, Jeremy had restrained and attempted to tape Lindsay's arms during an argument.

- The officers knew that although Lindsay had made a report to Zeigler of domestic violence against Jeremy, she refused to press charges.

- The officers knew they were walking into a potentially dangerous situation.

- Zeigler told Chambers that there had been an argument and to "use extreme caution" because Zeigler did not "know what [they were] going to run into there."

- The officers knew that Jeremy may have a gun.

When they arrived at the residence, the house was dark.  When Jeremy opened the

door, he was angry, visibly upset, and holding a pistol.  Lindsay admits that Jeremy opened

the door more quickly than normal.  Although the officers did not identify themselves, they

were in uniform.

Chambers and Cox immediately asked Jeremy to put down the gun.  Instead, Jeremy

looked to Lindsay and said, "really?"  Lindsay responded "I didn't call them."  Repeated

demands to Jeremy to put down the gun were ignored.  Cox said he was going to use his taser on Jeremy.  It was then that Jeremy attempted to shut the door.

Based on the information possessed by Chambers and Cox, a reasonable officer could have believed that there was a potentially dangerous situation evolving, particularly in light of Jeremy's his refusal to put down the gun.  The plaintiffs concede that the officers could knock on the door and ask questions. However, they assert that when Jeremy attempted to close the door, the officers were then precluded from taking any further action because Jeremy had not committed any crime.  The plaintiffs rely on *Kentucky v King*, support their position.

> And even if an occupant chooses to open the door and speak to the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

563 U.S. at —, 131 S.Ct. at 1862.

Their reliance is misplaced.   Jeremy's right to control the conversation is not unlimited, and *Kentucky v. King*, *supra*, does not stand for the proposition that police officers are required to allow an armed and potentially dangerous man to barricade himself in a house with a possible hostage. *See generally United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002) ("Although the Fourth Amendment protects the sanctity of the home, its proscription against warrantless searches must give way to the sanctity of human life.")

The plaintiffs also contend that the officers created the exigent circumstances by insisting that Jeremy put down his gun. The court disagrees.  It was Jeremy's failure to put

down his weapon that created the exigency.  *See Kentucky*, 563 U.S. at —, 131 S.Ct. at 1858.

> When officers respond to an emergency, "the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Id.* at 1338. The officer's conduct is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Id.* at 1339 (quotation marks omitted).  In addition, the officer's "warrantless search must be strictly circumscribed by the exigencies which justify its initiation. . . ." *Mincey,* 437 U.S. at 393, 98 S.Ct. at 2413 (quotation marks omitted).

*Roberts*, 643 F.3d at 905.

Considering all the information that the officers had about Jeremy – his anger, the prior domestic violence incident, and his refusal to relinquish the firearm – not only could reasonable officers have believed that they could enter the house to protect themselves and Lindsay,[21] *see Sheehan*, — U.S. at —, 135 S.Ct. at 1774-75, but it was also reasonable for Chambers and Cox to believe they could draw their weapons to protect themselves and Lindsay, and to encourage Jeremy to put down his gun.  When Jeremy attempted to retreat into house while still armed, a reasonable officer could have believed that he could take steps to protect himself and occupants of the house. "[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to *protect an occupant from imminent injury*." *Stewart*, 547 U.S. at 403 (emphasis added).  The defendants "acted within [their] authority" to remain on the property to ensure the safety of

---

[21]  The court recognizes that Lindsay said she did not fear Jeremy. However, whether Lindsay was afraid of Jeremy is not material because the issue is whether a reasonable officer could believe that she was in danger.

Lindsay and any other occupants of the residence.  *See generally Roberts*, 643 F.3d at 904. Thus, the state of the law did not give the officers "clear warning" that their conduct was unconstitutional; rather, the law supported their actions.

In this case, Jeremy was angry, visibly upset, armed and refusing to surrender his weapon after the officers asked him several times to do so.  The situation was rapidly escalating into a dangerous, possibly life-threatening crisis.  Chambers and Cox had information that Jeremy was potentially violent, and his refusal to put down the gun did not dissuade the defendants of that notion.

In *Sheehan*, the Supreme Court recently affirmed the entitlement of qualified immunity to police officers in a somewhat factually similar case.  — U.S. at —, 135 S.Ct. at 1774.  In *Sheehan*, law enforcement officers were called to a group home to conduct a welfare check on Teresa Sheehan, a woman suffering from mental illness.[22]  The officers got no response when they knocked.  Using a key to enter her room, Sheehan yelled that she had a knife and ordered the officers to leave her room.  Believing that Sheehan was a threat to herself and others, the officers returned to her room, announced their presence and said they wanted to help her. In response, Sheehan grabbed a knife and threatened them.  The officers retreated a second time but were concerned because Sheehan was armed and behind a closed door.  "With the door closed, all that [the officers] knew for sure was that Sheehan was unstable, she had just threatened to kill three people, and she had a weapon."  *Sheehan*, —

---

[22]  The court in no way suggests that Jeremy was suffering from mental illness.

U.S. at —, 135 S.Ct. at 1770.  The officers pushed the door open and one officer began to use pepper spray on Sheehan.  Sheehan did not drop her knife but advanced instead towards the officers.  The officers shot her multiple times.[23]  *Id*. at 1771.  The Supreme Court concluded that the use of force, including the use of deadly force, was reasonable because Sheehan advanced towards the officers even after the use of pepper spray did not subdue her, and she was armed with a knife.

In this case, Cox's deployment of the taser did not subdue Jeremy.[24]  He was armed with a gun, and he was rising to his feet when defendant Chambers shot and killed him.[25]  "Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though it meant firing multiple rounds."  *Sheehan*, — U.S. at —, 135 S.Ct. at 1775.

> [E]ven if [the officers] misjudged the situation, [Acre] cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Id*., at 1190. Courts must not judge officers with "the 20/20 vision of hindsight." *Ibid*. (quoting *Graham*, 490 U.S., at 396).

*Id*., at 1777.

---

[23]  Sheehan fortunately survived.

[24]  Even if there is some dispute about whether Jeremy was on the ground when he was shot, as the Court noted in *Sheehan*, "[t]his dispute is not material: "Even if Sheehan was on the ground, she was certainly not subdued." 743 F.3d 1211, 1230 (CA9 2014)." — U.S. at —, 135 S.Ct. at 1771, fn. 2.

[25]  After the motions for summary judgment were briefed, and after oral argument, in a supplemental brief, the plaintiffs rely on *Pruitt v. Gillespie*, No. 15-11200 (11th Cir. Aug.15, 2015) to argue that the court should pay "no attention" to the defendants' contention that they were going to arrest Jeremy for obstructing governmental operations because they made no mention of the arrest to the ABI investigators or in their post-shooting reports.  *See* Doc. # 105 at 2.  Whether Chambers or Cox had probable cause or arguable probable cause to arrest Jeremy for obstruction of governmental operations is immaterial in light of the court's conclusion that they are entitled to qualified immunity.

The plaintiffs have cited no binding precedent that would indicate to a reasonable officer that the actions taken by Chambers and Cox were unlawful.  The events on March 19, 2013 and the loss of Jeremy's life is deeply distressing and regrettable.  However, in part, the qualified immunity defense "recognizes the problems that government officials like police officers face in performing their jobs in dynamic and sometimes perilous situations." *Merricks*, 785 F.3d at 558.  Based on the facts of this case, the court concludes that defendants Chambers and Cox are entitled to qualified immunity "because these officers had no "fair and clear warning of what the Constitution requires."  *Sheehan*, — U.S. at —, 135 S.Ct. at 1778.  In other words, because existing precedent did not place the "constitutional question beyond debate," the defendants are entitled to qualified immunity. *See al-Kidd*, 563 U.S., at —, 131 S.Ct. at 2085.

### IV.  CONCLUSION

Accordingly, it is the ORDERED and ADJUDGED that:

1.     The plaintiffs' motion to strike (doc. # 93) be and is hereby DENIED.

2.     The plaintiffs' motion for summary judgment (doc. # 70) be and is hereby DENIED;

3.     The defendants' motion for summary judgment (doc. # 84) be and is hereby GRANTED.

4.     This case be and is hereby DISMISSED with prejudice, with each party to bear its own costs; and

5.      All pending deadlines are terminated and the pretrial conference and trial of this case be and are hereby CANCELED.

Done this 8th day of September, 2015.

　　　　　　　　　　　　/s/Charles S. Coody
　　　　　　　　　　CHARLES S. COODY
　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE